ORIGINAL

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawai'i  96793
Telephone:  (808)242-4956
Facsimile:  (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiffs
Donald Norris and Darcy Norris

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 10 2011

at _____ o'clock and ___ m ___ M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAI'I

DONALD NORRIS AND DARCY NORRIS,

          Plaintiffs,

v.

COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE HOME
LOANS, INC.; BANK OF AMERICA
CORPORATION; THE BANK OF NEW
YORK MELLON AS TRUSTEE FOR THE
ALTERNATIVE LOAN TRUST 2007-HY3
MORTGAGE PASS-THROUGH
CERTIFICATES SERIES 2007-HY3;
BAC HOME LOANS SERVICING, LP;
RYAN MCNALLY; GREG BROWN; JOHN
AND MARY DOES 1-6,

          Defendants.

Civil No. CV11 00156 LEK KSC

COMPLAINT; EXHIBIT "1" – "5";
DEMAND FOR JURY TRIAL; SUMMONS

## COMPLAINT

Plaintiffs DONALD NORRIS and DARCY NORRIS (hereinafter "Plaintiffs"), by and through their attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited liability law company, bring the following Complaint and allege and aver as follows:

## JURISDICTION AND VENUE

1.   Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. § 2 and under 28 U.S.C. § 1332 (Diversity Jurisdiction).

2.   This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawai'i Revised Statutes ("HRS") by virtue of pendent jurisdiction.

3.   Venue is proper in the United States District Court for the District of Hawai'i, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized or operating in the State of Hawai'i, the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

4.   Plaintiffs Donald Norris and Darcy Norris are, and at all relevant times were, over the age of eighteen and reside at 59A Kumu Niu Place, in the County of Maui, State of Hawai'i (TMK (2) 3-9-003-064) (the "Subject Property").

5.   Defendant Countrywide Financial Corporation ("Countrywide Financial") was, at all relevant times, a Delaware Corporation with its principal executive offices located at 4500 Park Granada, Calabasa, California.   Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.   As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

6.   Defendant Countrywide Home Loans, Inc. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California.   Countrywide Home originates and services residential home mortgage loans.   Countrywide Home served as the original lender of Plaintiffs' home mortgage loan.

7.   The Defendants identified in ¶¶ 6-7 are hereinafter collectively referred to as the "Countrywide Defendants" or "Countrywide".

8.   Defendant  Bank  of  America  Corporation  ("Bank  of America")  is  a  successor  to  Defendant  Countrywide,  as  described in  ¶¶  50-55.   On  July  1,  2008,  Countrywide  Financial  completed  a merger  with  Red  Oak  Merger  Corporation  ("Red  Oak"),  a  wholly owned  subsidiary  of  Bank  of  America  that  was  created  for  the sole  purpose  of  facilitating  the  acquisition  of  Countrywide, pursuant  to  an  Agreement  and  Plan  of  Merger,  dated  as  of  January 11,  2008,  by  and  among  Bank  of  America,  Red  Oak,  and  Countrywide Financial.   Bank  of  America  has  assumed  Countrywide's liabilities,  having  paid  to  resolve  other  litigation  arising from  any  future  misconduct  allegedly  committed  by  Countrywide. At  the  time  of  Bank  of  America's  purchase  of  Countrywide,  a  Bank of  America  spokesperson  publicly  stated:  "We  bought  the  company and  all  of  its  assets  and  liabilities… We  are  aware  of  the claims  and  potential  claims  against  the  company  and  have factored  there  into  the  purchase."   Bank  of  America  is  a successor-in-interest  to  the  Countrywide  Defendants  and  is  thus vicariously  liable  for  the  conduct  of  the  Countrywide  Defendants alleged  herein.

9.   Defendant  BAC  Home  Loans  Servicing,  LP  ("BAC  Home Loans  Servicing")  is  a  limited  partnership  and  subsidiary  of Bank  of  America  with  its  principal  offices  at  4500  Park  Granada, Calabasas,  California.   BAC  Home  Loans  Servicing  is  identified in  mortgage  contracts  and  other  legal  documents  as  "BAC  Home

Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP", indicating that it was formerly known as Countrywide Home Loans Servicing LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they were originated.

10. The Defendants identified in ¶¶ 8-9 are hereinafter collectively referred to as the "Bank of America Defendants".

11. Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and is a wholly-owned subsidiary of MERSCORP, Inc. MERS operates an electronic registry designed to track servicing rights and ownership of mortgage loans (promissory notes) in all fifty states in the United States. MERS acts solely in an administrative capacity as an agent for the owner of the notes.

12. Defendant Bank of New York Mellon ("BNY Mellon") is, and at all relevant times was, a New York corporation with its head offices in the State of New York. BNY Mellon provides a range of financial services including, *inter alia*, asset management, asset servicing, wealth management, advisory services, issuance services and treasury services. Defendant BNY Mellon was the Trustee for Alternative Loan Trust 2007-HY3 Mortgage Pass-Through Certificates, Series 2007-HY3 (the

"Trust"), pursuant to a Pooling and Servicing Agreement, dated as of February 1, 2007 (attached hereto as Exhibit 1) ("PSA").

13.   Defendant Ryan McNally ("McNally") was, at all relevant times, a Senior Loan Consultant and Sales Manager of the Kihei Branch of Countrywide Home Loans.  McNally acted as a mortgage broker on behalf of Plaintiffs in arranging and negotiating loans with third party institutions for the benefit of Plaintiff.  McNally is, and was at all relevant times, a resident of the State of Hawai'i.

14.   Defendant Greg Brown ("Brown") is, and at all relevant times was, the owner of BD Brown Properties Hawai'i, the real estate development company that built the Subject Property.  Brown is, and at all relevant times was, licensed as a real estate broker and resident of the State of Hawai'i.

15.   Defendants JOHN AND MARY DOES 1-6 ("DOES DEFENDANTS 1-6), inclusive, are individuals, partnerships, corporations, associations or any other entity claiming any legal or equitable right, title, estate, lien, or other interest in the Subject Property.  Plaintiffs reserve the right to amend this Complaint to add any such party as described in this paragraph as such party's identity is ascertained through discovery or otherwise.

## BACKGROUND TO THIS COMPLAINT

**Traditional Role of Banks**

16.   The role of banks has changed in the last two decades. Traditionally, banks profited by charging borrowers a higher interest rate on the repayment of its loans than they paid to depositors.   The obligation to repay the loan was recorded on, and remained in, the books of the original lender until such time as the loan was repaid in full.   Lenders were therefore inextricably invested in the ability of the borrower to repay the loan.   In other words, the bank held the risk of the borrower's potential default.

17.   Real estate investments were traditionally made based on an expected appreciation in the value of the land over time. Speculative trading in mortgage-based assets by institutional investors in open securities markets were primarily achieved by investing in a corporation (or other entity) set up to buy and sell interests in real property.   It was not possible for investors in open markets to speculate on individual family homes.

18.   Land records, including, mortgages, deeds of title, and assignments of mortgages were recorded in the Hawai'i Bureau of Conveyances or the Assistant Registrar of the Land Court (or both) by the original lender.   Each of these records was therefore publicly available.

19.   In  1993,  there  were  only  24,000  subprime  mortgages (where  the  borrower  does  not  meet  standard  underwriting criteria)  used  to  purchase  homes,  with  80,000  subprime  refinance loans.  Prime  purchase  mortgages  numbered  2.2  million,  and  5.2 million  prime  refinance  loans.  In  other  words,  there  were  70 prime  loans  for  every  subprime  loan.[1]

**Securitization and Mortgage-backed Assets**

20.   Securitization  has  fundamentally  changed  the  way  banks and  other  financial  market  participants  conducted  business.    A "securitization"  is  a  financial  transaction  in  which  assets  –  in this  case,  mortgages  –  are  pooled  and  securities  representing interests  in  the  pool  are  issued  to  investors.

21.   In  the  instant  case,  "mortgage-backed  securities" ("MBS")  are  debt  obligations  that  represent  claims  to  the  cash flows  from  pools  of  mortgage  loans,  most  commonly  on  residential property.    The  originating  lenders  (banks  or  mortgage  companies) sell  the  mortgage  loans  to  a  "special  purpose  vehicle"  ("SPV"). SPVs  are  typically  US-style  trusts  established  specifically  to facilitate  the  securitization.

---

[1] Simon Johnson and James Kwak, "13 Bankers: The Wall Street Takeover and the Next Financial Meltdown" (2010), at p. 127, citing HDMA data gathered by the Federal Financial Institutions Examination Council, matched with the HUD list of subprime lenders; cited in Kenneth Temkin, "Subprime Lending: Current Trends and Policy Issues," The Neighbor_Wors Journal, Spring-Summer 2000, available at http://knowledgeplex.org/kp/text_document_summary/article/relfiles/partner_content/nrc/ht_nrc_temkin.pdf.

22.   The SPV may hold the mortgage on its balance sheet or place it in a separate trust.   In either case, the SPV sells bonds to investors and uses the proceeds from these bond sales to pay the originating lender for the mortgage.

23.   The *Secondary Mortgage Market Enhancement Act of 1984* laid the way for present-day securitization by sidelining the tax and state regulations that previously prevented banks and other entities from securitization.   Investment banks could now buy mortgages, pool them, divide them into "tranches" (divisions of risk) and sell them to investors.   Banks could now make money by, *inter alia*, (1) originating mortgages; (2) securitizing loans; (3) selling MBS (or other asset-based securities) to investors; (4) and trading in securities.   Securitization meant that loans could be resold in the secondary market, thereby making mortgage origination fee driven and volume driven.

24.   Because securitization requires the originating lender to immediately sell the mortgage to an SPV, the lender no longer carries the inextricable risk associated with the borrower's potential default.   The lender no longer has the same economic incentives to ascertain the creditworthiness of the borrower.

25.   Moreover, in an effort to meet the demand in the secondary market for increasingly "sophisticated" financial products, lenders become more and more creative in the types of loans that are marketed to borrowers.   Such a need for new

products, in combination with the moral hazards created by securitization, has led to an unprecedented level of risk in the origination of mortgages.

## Consolidation and Growth of Top-Tier Financial Institutions

26. With the mortgage industry booming, large banks began acquiring subprime lenders. Among the top 25 subprime lenders, First Franklin was bought by National City and alter by Merrill Lynch; Long Beach Mortgage was bought by Washington Mutual; Household Finance was bought by HSBC; BNC Mortgage was bought by Lehman Brothers; Advanta was bought by JPMorgan Chase; Associates First Capital was bought by Citigroup; Encore Credit was bought by Bear Stearns; and American General Finance was bought by AIG.[2] Not only did the big banks want the fees generated by subprime mortgages, these mortgages would feed the banks' own securitization business.

27. The wave of mergers consolidated economic and political power in a handful of megabanks, among them Citigroup, Bank of America, J.P. Morgan, Chase, First Union, and Wells Fargo. The passage of the *Gramm-Leach-Bliley Act* in 1999 meant that investment banking - including buying, selling, trading

---

[2] Simon Johnson, "13 Bankers," Id. at page 128, citing Alyssa Katz, Our Lot: How Real Estate Came to Own Us (New York: Bloomsbury, 2009), 70; Center for Public Integrity, Who's Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, available at http://www.publicintegrity.org/investigations/economic_meltdown/the_subprime_25/.

mortgage-backed securities – was now given a government bail-out guarantee previously only given to traditional banks.

28.   The term "too big to fail" ("TBTF") refers to certain financial institutions that are so large and interconnected that they cannot be allowed to go into uncontrolled bankruptcy; defaulting on their obligations will create significant losses for other financial institutions, potentially triggering a domino effect that causes the entire financial system to collapse.[3]

29.   What makes a financial institution too big to fail is the amount of collateral damage that its uncontrolled failure could cause.   This damage can take several different forms.   A failing institution could have thousands of open transactions with counterparties, which are largely other financial institutions.[4]   A failing bank may have sold credit default swap ("CDS") protection on various securities; its counterparties are assuming that they are perfectly hedged because of those swaps. However, when the bank fails, suddenly those hedges disappear

---

[3]     For example, the bankruptcy of Lehman Brothers ("Lehman") in September 2008 accelerated the collapse of American International Group ("AIG"), forcing it rely on funds from the Federal Reserve.   Lehman's failure also caused a sudden loss of confidence in all money market funds; in turn, the flood of money out of the money market funds cause the commercial paper market to freeze, thus endangering the ability of many corporations to operate on a day-to-day basis.   The sequence of failures was only stopped by massive government rescue measures.

[4]     For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion – $1 trillion of it was held by only twelve financial institutions.

and the counterparties are forced to take large losses on the underlying securities.

30.  Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

31.  First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers).  A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal.  This means that government must keep failing banks afloat and, without and, without a credit threat of bankruptcy to negotiate with, must honor all of the bank's obligations; in other words, the money the bank lost has to be made up with public funds.

32.  The second problem to society is that TBTF institutions have a strong incentive to take excessive risk, since the government effectively guarantees their losses in an emergency.  All banks are highly leveraged, which means that they are betting with other people's money.  There are many strategies – of which, securitization is the most popular – that increase returns for shareholders (and executives) while shifting potential losses onto someone else.

33.   The third and arguably most significant problem for society is that TBTF banks are bad for competition and therefore bad for the economy.   Because large "megabanks" have an implicit government guarantee, bond investors are willing to lend them money at lower interest rates than their smaller competitors. This subsidy makes it harder for smaller banks to compete, deterring new entrants and only strengthening the long-term process of consolidation and concentration in the financial sector.

34.   At present, there are at least six banks that are considered too big to fail – Bank of America, Citigroup, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.   Of these six megabanks, four – Bank of America, Wells Fargo, Citigroup and JPMorgan Chase – maintain over 63% of the market share for mortgage originations

## FACTUAL ALLEGATIONS

35.   The allegations contained in the preceding paragraphs of this Complaint, particularly ¶¶ 16-34, are incorporated herein by reference.

### Defendant Countrywide's Business Acts and Practices

36.   The Countrywide Defendants originated mortgage loans and home equity lines of credit ("HELOCs") through several channels, including a retail channel.   The Countrywide employees

who marketed, sold or negotiated the terms of mortgage loans and HELOCs directly to consumers in the retail channel, are referred to herein as "loan officers".

37. Countrywide maintained sophisticated databases by means of which corporate management could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. The Countrywide Defendants used this information, together with data they received relating to secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

38. In 2004, the Countrywide Defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market. The Countrywide Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them and to sustain homeownership.

39. Defendants employed various lending policies to facilitate their deceptive scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of

low- or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; and  (c) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

40.   Moreover, the Countrywide Defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loans as they could without regard to the borrower's ability to repay.   The Countrywide Defendants' high-pressure sales environment also drove loan officers to sell the riskiest types of loans such as hybrid adjustable rate mortgages ("Hybrid ARMs") (described below), because loan officers could easily sell such loans by deceptively focusing borrowers' attention on the low initial monthly payments or interest rates.   In pushing borrower's into the riskiest types of loans, loan officers intentionally misrepresented the full, true and plain options available to borrowers.

41.   The  abovementioned  business  practices  of  the Countrywide Defendants are not unknown.   In 2008, the Attorney General of the State of California filed a complaint against Countrywide ("California Complaint") alleging, *inter alia*, that:

(a)   The primary purpose of Countrywides' deceptive business practices was to maximize profits from the sale of loans to the secondary market;

(b)   Countrywide engaged in deceptive practices in the sale of complex and risky loans to consumers, including Hybrid ARMS;

(c)   Countrywide eased and disregarded underwriting standards in order to increase its market share;

(d)   Countrywide engaged in deceptive marketing practices to sell increasing numbers of loans; and

(e)   In order to increase market share, Countrywide created a high-pressure sales environment where employees were rewarded for selling as many loans as they could without regard to borrowers' ability to repay;

42.   The California Complaint resulted in a $8.68 billion nation-wide settlement. The settlement was aimed at enabling borrowers to avoid foreclosure by, *inter alia*, obtaining modified or affordable loans. The modification program was designed to cover qualifying mortgages, including Hybrid ARM loans.

***Hybrid ARM Loans***

43.   Countrywide offered a 5, 7 and 10 year Hybrid ARM loan marketed as having a "fixed" or "fixed period' interest rates. In fact, these loans carried a fixed interest rate for the first 5, 7 or 10 years, respectively.   However, when the fixed rate period expires, the interest rate adjusts once per year and is determined by adding a margin to a rating index (such as the London Interbank Offered Rate or "LIBOR").

44.   The Countrywide Defendants marketed the Hybrid ARMS by emphasizing the low monthly payment and low "fixed" initial interest rate.   The Countrywide Defendants misrepresented the true terms of these loans by obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and misrepresenting the amount by which payments could increase once the initial fixed rate expired.   Rather than selling the monthly payment amounts, it would sell the rate.   Countrywide focused exclusively on the initial "fixed" interest rate without discussing that the rate would reset after the initial period to a potentially much higher rate.

45.   Moreover, many borrowers were not given adequate time to read their loan documents and disclosures before signing them.   It was Countrywide's practice to make borrowers sign a large stack of documents without first providing the time to review them.   And, given the complexity of the Hybrid ARMs, many

borrowers who did read their loan documents did not understand the true terms of the loans they were being sold. Borrowers subjected to any of the deceptive marketing practices described above would not understand the true risks and potential unaffordability of their loan.

46. Even if borrowers did understand the terms of their Hybrid ARM loans, Countrywide induced borrowers into accepting such loans by misleading the borrower's ability to refinance at a future date. Countrywide's loan officers overcame borrowers' concerns about increased monthly payments or increasing interest rates by promising that they would be able to refinance with Countrywide into a loan with more affordable terms before the payments or rate reset.

47. In order to provide loans en masse for sale to the secondary market, the Countrywide Defendants created a high-pressure sales environment in which Countrywide employees and loan officers were compelled to sell and process as many loans as possible, as quickly as possible, and at the highest prices.

48. Countrywide's compensation system was tied created this pressure through a compensation system, which predictably led employees to disregard Countrywide's minimal underwriting guidelines and to originate loans without regard to their sustainability. Countrywide's compensation system also

motivated its loan officers to engage in the deceptive marketing practice described in the preceding sections.

49.   Branch managers were rewarded for meeting production goals set by corporate management and were only eligible for commissions and bonuses if they met certain minimum requirements.   Countrywide provided branch managers with access to computer applications and databases that allowed them to monitor loan sales on a daily basis and pressure employees to "sell, sell, sell".   A branch manager could input the type of loan (such as a Hybrid ARM), and determine what price a borrower would pay for that loan as well as the amount of profit the loan would likely generate for the branch.   With these tools, Countrywide's branch managers were able to exert constant pressure on loan officers and underwriters to do their part in increasing loan production.

50.   Not only did this compensation system create incentives for loan officers to sell as many loans as possible, as quickly as possible, it also create incentives for retail loan officers to steer borrowers into riskier loans.   Loan officers were paid greater commissions and bonuses for selling certain types of high-risk loans, including Hybrid ARM loans.

**Defendant Bank of America is Vicariously Liable for the Acts of the Countrywide Defendants**

51.  As Countrywide's successor in liability, Bank of America is jointly and severally liable for any and all damages resulting to Plaintiffs from the wrongful actions of the Countrywide Defendants.  Bank of America itself has acknowledged that its acquisition of all of Countrywide's assets through an all-stock transaction on July 1, 2008 was a "merger".  In a July 2008 press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  According to Bank of America, it "anticipates substantial cost savings from combining the two companies," from eliminating employment positions, and from reducing overlapping technology, vendor and marketing expenses.  Desoer added that "the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."

52.  Desoer was also interviewed for the May 2009 issue of *Housing Wire*, which reported that one of the assets that Bank of America acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the

bank will be migrating some aspects of Bank of America's mortgage operations over to Countrywide's platforms.

53. Bank of America also reported to the Securities and Exchange Commission ("SEC") that on November 7, 2008, Countrywide Financial and Countrywide Home "transferred substantially all of their assets and operations to [Bank of America]." This transfer of assets was "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations." Countrywide also ceased submitting filings to the SEC, which are now submitted as part of Bank of America's filings. Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

54. A spokesperson for Bank of America confirmed: "We bought the company and all of its assets and liabilities." Similarly, a January 23, 2009 *New York Times* article quoted Kenneth D. Lewis (who at the time was Bank of America's Chairman and CEO), acknowledging that Bank of America had factored Countrywide's liabilities into the price it paid to acquire Countrywide: "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a very good price."

55.  Consistent with its assumption of Countrywide's liabilities, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by agreeing to loan modifications, an agreement valued up to $8.4 billion.  Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements.  In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide.  On January 3, 2011, Bank of America paid $2.8 billion to government sponsored enterprises Freddie Mac and Fannie Mae to settle claims of misrepresentations on billions of dollars in loans that went sour after Fannie and Freddie bought them from Countrywide.  In exchange for the payments, Freddie Mac and Fannie Mae agreed to drop their demands that Bank of America buy back the mortgages. The payment of $1.28 billion to Freddie Mac settled 787,000 loan claims (current and future) sold by Countrywide through 2008. The payment of $1.34 billion (after applying credits to an agreed upon settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and

other specific claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

56.   Upon information and belief, Bank of America has been operating Countrywide Home effectively as a division of Bank of America.   To that end, on April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired."   Bank of America advised that it is operating the Countrywide home loan and mortgage businesses as a "division" named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."   The Bank of America Home Loans division is headquartered at Countrywide's offices in Calabasas, California.

**Plaintiffs' Mortgage Loans with Defendants Countrywide, McNally and Brown**

57.   In 2006, Plaintiffs began the process of purchasing the Subject Property from Defendant Brown.   At the time, Plaintiffs were living at their home in California (the "California Property").   Plaintiffs engaged the services of Defendant McNally to arrange their mortgage financing.

58.   Plaintiffs and Defendant Brown had initially agreed that, as part-consideration for the Subject Property, Plaintiff and Brown would do an exchange under section 1031 of the Internal Revenue Code ("1031 exchange") in order to defer the

recognition of capital gains tax due upon the sale of either property.   Plaintiffs proceeded with arranging their mortgage financing with Defendant McNally on this basis.

59.   Defendant Brown subsequently withdrew his offer to do the 1031 exchange.   Instead, Brown offered to carry a $300,000 note on the down payment of the Subject Property, using Plaintiffs' California Property as collateral ("Brown Note"). Brown proceeded deal with Plaintiffs in negotiating a third deed of trust on the California Property as security for the $300,000 note ("Brown Deed of Trust").   It was agreed that Plaintiffs would repay the Brown Note upon the sale of the California Property.   Plaintiffs had one year to sell the California property and repay Brown.

60.   When Defendant Brown delivered the Brown Note and Brown Deed of Trust to Plaintiffs for execution, the paperwork was all in the name of Jessica Taguiped ("Taguiped").   Upon information and belief, Taguiped was, at the relevant time, the wife of Brown.   When asked by Plaintiffs why the Brown Note and Brown Deed of Trust were in the name of Brown's wife, Defendant Brown stated that it was for "tax purposes."   It was only immediately prior to closing that Plaintiff discovered from Brown the true reason for having the Brown Note and Brown Deed of Trust in the name of Taguiped; because McNally had told Brown

that he did not want Countrywide to know that Brown was involved in helping with the down payment.

61.   Sometime after Plaintiffs had prequalified for the Mortgage through Countrywide but prior to closing, Defendants McNally and Brown each approached Plaintiffs suggesting that Plaintiffs also purchase the ohana at 63 Kumu Niu Place, Lahaina ("Ohana Property") as an investment property.   Both Defendant McNally and Defendant Brown individually represented to Plaintiff the significant value that the Ohana Property had as a vacation rental.   Both McNally and Brown made numerous representations to Plaintiffs about how the Ohana Property would "pay for itself" because Plaintiffs could rent it out as a vacation rental and would create more income than the monthly mortgage.   Defendant Brown represented that he routinely rented out one of his homes for approximately $5,000 a day and that the Ohana Property had the same potential.

62.   However, Brown and McNally knew, or ought to have known – given that they were both primarily in the business of selling real estate – that there was a significant backlog of applications for "conditional permits" that are required to conduct a vacation rental business in an agricultural or farm zoned district, which is where the Ohana Property is situated.

63.   Moreover, Brown and McNally knew, or ought to have known that, despite the misperception among TVR operators that

they had a "contract" with the Country of Maui which allowed them to operate without a permit in areas not zoned for their business, the District Court ruled that there was no such contract.

64. As such, Plaintiffs were effectively misled by Brown and McNally when they were advised that a permit was not necessary or that the permitting process was a simple and straightforward one.

65. Plaintiffs initially declined the purchase of the Ohana Property out of concern that it would increase the amount of down payment they would be required to give in order to purchase both properties. However, McNally represented that he could arrange financing for the Ohana Property without increasing the total down payment that would be paid by Plaintiffs. Before closing on the Subject Property, Defendant McNally made arrangements with Rick Smith ("Smith") — a former colleague of McNally's from Countrywide who, at the relevant time, was a loan officer for First Horizon — to obtain a mortgage for the Ohana Property. Defendant McNally arranged and negotiated the mortgage for the Ohana Property with Smith on behalf of and allegedly for the benefit of Plaintiffs.

66. Plaintiffs asked McNally why they could not arrange the mortgage for the Ohana Property through Countrywide given that Plaintiffs were already a customer of Countrywide by virtue

of the Mortgage on the Subject Property. McNally stated that it was important that the mortgages be kept separate; however, he did not provide a reason for this importance. McNally also stated, without adequate justification, that it was important that both loans closed simultaneously. McNally stated to Plaintiffs that if the loans did not close simultaneously, they would not be able to get either loan.

67. Relying on the representations by Brown and McNally that the Ohana Property was a valuable investment opportunity, and under the belief that both properties must close simultaneously or Plaintiffs risked losing both loans, Plaintiffs proceeded with the closings for each property.

68. Countrywide issued the final approval letter to BD Brown Development so that Plaintiffs could move into the Subject Property. Plaintiffs arranged for movers to pack their home in California and shipped two forty-five foot containers of furniture and other home appliances to Maui. Plaintiffs also shipped four vehicles and had two pets shipped and quarantined on Maui. Plaintiffs had to rent an apartment for two weeks on account of several delays in closing. Upon the consent of Brown, Plaintiffs arranged for movers to begin unpacking their belongings several days before they were due to close escrow. In total, Plaintiffs had already incurred approximately $35,000 in relocation costs prior to closing.

69.  The day before closing, McNally called Plaintiffs and stated that Countrywide had demanded an immediate additional $300,000 down payment despite pre-qualifying for the original loan and down payment amount and despite the final approval letter being issued to BD Brown Developments.  McNally stated that the loan officer with whom he regularly processes loans had moved to the mainland and that the new loan officer did not know how to process condominium properties.  However, McNally was evasive and would not provide more details when asked by Plaintiffs about how Countrywide had determined the additional $300,000.

70.  It was, and remains, unclear to Plaintiffs exactly why McNally demanded the additional down payment amount.  Plaintiffs were upset and skeptical about the last minute demand. Plaintiffs told Defendant McNally that the additional $300,000 was not part of the agreement that they had negotiated and that it was unjust to make such demands the day before closing.  On that basis, Plaintiffs stated to McNally that they would not be going ahead with the loan and that they would be returning to California.  Plaintiffs were considering pursuing litigation against McNally and Countrywide at this time.

71.  The following day, McNally called Plaintiffs and stated that the additional down payment amount had been reduced from $300,000 to $150,000.  McNally stated that he was "able to

convince" the loan officer for Countrywide to reduce the amount. Plaintiffs were still unwilling to accept the new terms of the agreement and had decided to return to California and pursue litigation to recover the costs associated with the move.

72. Later on the same day, McNally called Plaintiffs and offered a personal advance to Plaintiffs for $150,000, which would have to be repaid in a year.   McNally and Brown were currently selling a property on Lana'i and McNally promised that, upon the sale of that property, he would personally loan Plaintiffs $150,000 to make up for the additional down payment that was being demanded at the time of closing.

73. Based on that promise, Plaintiffs executed a promissory note, dated February 26, 2007 (the "Promissory Note" or "Note") agreeing to pay $2,325,000 plus interest to Countrywide Home as "Lender".   On the same day, Plaintiffs entered into a mortgage (the "Mortgage") granting a security interest in the Subject Property to Countrywide Home (attached hereto as Exhibit 2).   The Mortgage document was recorded in the State of Hawai'i Bureau of Conveyances on February 9, 2007.

74. On February 28, 2007, Plaintiffs executed a promissory note in favor of McNally for a principal amount of $150,000 with a fixed interest rate of six percent ("McNally Note"). Principal and interest were to be payable in a single combined installment no later than March 31, 2008.  If the payment of any

interest or principal payable under the note was not made within ten days after the due date of such payment, the entire principal amount outstanding and accrued interest thereon was to become immediately due and payable and an increase default interest rate of ten percent would apply.  McNally took a second mortgage on the Subject Property as collateral for the McNally Note.

75.  On November 25, 2009 an Assignment of Mortgage was executed by MERS "solely as nominee" for Countrywide Homes in which it purports to transfer to BNY Mellon, as trustee for the Trust, "all of its right, title and interest in and to that certain mortgage recorded on 02/09/07 in the Bureau of Conveyances, State of Hawai'i, Regular System document number 2007-024936" (attached hereto as Exhibit 3).  The Assignment of Mortgage was recorded in the Bureau of Conveyances on February 1, 2010.

76.  There is another Assignment of Mortgage relating to the Subject Property dated July 1, 2010 and executed by MERS "solely as nominee" for Countrywide Home in which it also purports to transfer to BNY Mellon, as trustee for the Trust, "all of its right, title and interest in and to that certain mortgage recorded on 02/09/07 in the Bureau of Convenances, State of Hawai'i Regular System document number 2007-024936"

(attached hereto as Exhibit 4).   This Assignment of Mortgage was recorded in the Bureau of Conveyances on August 3, 2010.

77.   It is uncertain which Assignment of Mortgage, if either, was intended to assign the Mortgage to BNY Mellon.   In any case, the assignment is invalid on the grounds that MERS did not have the legal capacity to affect such a transfer, as discussed below.

78.   On August 27, 2010, a Notice of Mortgagee's Intention to Foreclose Under Power of Sale ("Notice of Foreclosure") was issued by BNY Mellon as "Mortgagee".   For reasons set forth below, Plaintiff submits that BNY Mellon does not have the legal authority proceed with a foreclosure on the Subject Property.

## CLAIM I
### (Declaratory Relief Against BNY Mellon)

79.   The Declaratory Judgment Act, *28 U.S.C. § 2201*, provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

> *28 U.S.C. § 2201(a).*

80.   Plaintiffs submit that an actual controversy exists with respect to whether or not BNY Mellon has the legal

authority to foreclose on the Subject Property. As such, Plaintiffs request declaratory judgment to determine that BNY Mellon, in fact, does not have the legal authority to foreclose on the Subject Property for at least the following reasons:

(a) BNY Mellon is not a valid assignee of the Mortgage and therefore has no legal right to enforce the Mortgage. MERS did not have the legal authority to assign the mortgage to BNY Mellon because MERS was, at all times, acting "solely as a nominee" for Countrywide Home.

(b) The original Note was never delivered to subsequent purchasers, but rather remained in the possession of Countrywide Homes thereby clouding any title claims that may arise in respect of the Note.

(c) Even if this court finds that MERS has the legal authority to assign a mortgage as nominee for Countrywide Home, Plaintiffs submit that the Mortgage was not assigned to BNY Mellon prior to the "Cut-Off Date" of the Trust, in breach of Section 2.01 of the PSA governing the Trust. As such, the Mortgage was never validly deposited into the Truest and never formed part of the assets of the Trust.

**(a)   MERS did not have legal authority to assign the Mortgage and, therefore, BNY Mellon is not a valid assignee entitled to enforce the Mortgage.**

81.   With reference to MERS's role in Plaintiffs' mortgage loan transaction, the Mortgage states:

> MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Agreement.

82.   The Mortgage also purports to contain a transfer to MERS of Plaintiffs' rights in the Subject Property as follows:

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the [Subject Property].
>
> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

83.   The Assignment of Mortgage references the Mortgage and states:

> Mortgage Electronic Registration Systems,
> Inc. solely as nominee for Countrywide Home
> Loans, Inc., a New York Corporation, does
> hereby transfer without recourse to THE BANK
> OF NEW YORK MELLON, a New York corporation,
> AS TRUSTEE FOR THE ALTERNATE LOAN TRUST
> 2007-HY3 MORTGAGE PASS-THROUGH CERTIFICATES,
> SERIES 2007-HY3, whose address is, C/O Bank
> of America TX, Foreclosure Department, 7105
> Corporate Dr., MS:PTX-B-35, Plana, TX 75024,
> all of its right, title and interest in and
> to that certain mortgage recorded on
> 02/09/07 in the Bureau of Conveyances, State
> of Hawai'i, Regular System document number
> 2007-024936.

84.   Plaintiffs argue that MERS's "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage.

85.   In a 2006 published opinion, the New York Court of Appeals described MERS system as follows:

> In 1993, the MERS system was created by
> several large participants in the real
> estate mortgage industry to track ownership
> interests in residential mortgages.
> Mortgage lenders and other entities, known
> as MERS members, subscribe to the MERS
> system and pay annual fees for the
> electronic processing and tracking of
> ownership and transfers of mortgages.
> Members contractually agree to appoint MERS
> to act as their common agent on all
> mortgages they register in the MERS system.
>
> The initial MERS mortgage is recorded in the
> County Clerk's office with 'Mortgage
> Electronic Registration System, Inc.' named
> as the lender's nominee or mortgagee of
> record on the instrument. During the
> lifetime of the mortgage, the beneficial

> ownership interest or servicing rights may
> be transferred among MERS members (MERS
> assignments), but these assignments are not
> publicly recorded; instead they are tracked
> electronically in MERS's private system. In
> the MERS system, the mortgagor is notified
> of transfers of servicing rights pursuant to
> the Truth in Lending Act, but not
> necessarily of assignments of the beneficial
> interest in the mortgage.

> *Merscorp, Inc., v. Romaine*, 8 N.Y.3d 90
> (N.Y. 2006) (footnotes omitted).

86. There is little to no case law in the State of Hawai'i that interprets the role and legal status of MERS. Recently however, a New York Bankruptcy Court set forth a detailed analysis of the role of MERS because "MERS's role in the ownership and transfer of real property notes and mortgages is at issue in dozens of cases" (*In re Ferrel L. Agard*, Bkrtcy. No. 810-77338-reg (D.N.Y.) at *19). The Court stated that:

> Other than naming MERS as "nominee", the
> Mortgage also provides that the Borrower
> transfers legal title to the subject
> property to MERS, as the Lender's nominee,
> and acknowledges MERS's rights to exercise
> certain of the lender's right under state
> law. This too, is insufficient to bestow
> any authority upon MERS to assign the
> mortgage. In Bank of New York v. Alderazi,
> the court found "[t]he fact that the
> borrower acknowledged and consented to MERS
> acting as nominee of the lender has no
> bearing on what specific powers and
> authority the lender granted MERS."
> Alderazi, 900 N.Y.S.2d at 824. Even if it
> did bestow some authority upon MERS, the
> court in Alderazi found that the mortgage
> did not convey the specific right to assign
> the mortgage.

87.   The court concluded that naming MERS a "nominee" did not bestow authority upon MERS to assign the mortgage. (*Agard, Bkrtcy. No. 810-77338-reg (D.N.Y.)* at *31).

88.   In *LaSalle Bank, N.A. v. Bouloute, No. 41583/07, 2010 WL 3559552, at *2 (N.Y. Sup. Aug. 26, 2010),* the court analyzed the relationship between MERS and the original lender and concluded that a nominee possesses few or no legally enforceable rights beyond those of a principal whom the nominee serves.  The court further concluded that MERS must have some evidence of authority to assign the mortgage in order for the assignment of a mortgage by MERS to be effective.  Evidence of MERS's authority to assign could be by way of a power of attorney or some document executed by the original lender (*See Bouloute, 2010 WL 3559552, at *1*).

89.   In *Agard*, MERS argued that it had authority to act as "agent" for each and every MERS member which claims ownership of a note and mortgage registered in its system.  This authority is purportedly based on the terms and conditions of a MERS membership agreement.  Those terms and conditions provide that "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time." (*Agard, Bkrtcy. No. 810-77338-reg (D.N.Y.)* at *26).

90. Under Hawai'i agency laws, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." (*Restatement (Third) of Agency § 1.01*). Further, "[i]t is well established that '[a]n agency relationship may be created through actual or apparent authority.'" (*State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, *90 Haw. 315, 325, 978 P.2d 753 (1999)* (quoting *Cho Mark Oriental Food, Ltd. V. K & K Int'l*, *73 Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)*).

91. Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances." (*State Farm*, *90 Haw. At 325, 978 P.2d at 763* (quoting from *Cho Mark*, *73 Haw. At 515-16, 836 P.2d at 1061-62*)). Express actual authority "requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain things." (*Cho Mark*, *73 Haw. At 515-16, 836 P.2d at 1061-62*).

92. Because MERS's members, the beneficial noteholders, purported to bestow upon MERS interest in real property

sufficient to authorize the assignments of mortgage, the alleged agency relationship must be committed to writing by application of the statute of frauds.

93. Plaintiffs submit that neither the Mortgage, nor any other loan document which has been provided to Plaintiffs, evidences an agency relationship between MERS and Countrywide. In the absence of such express authorization, Plaintiffs submit that the assignment of her Mortgage by MERS to BNY Mellon was not a valid assignment because MERS did not have the legal authority as mere "nominee" of Countrywide to make such an assignment. As a consequence, Plaintiffs further submit that BNY Mellon is not a valid assignee of her Mortgage and therefore does not have the legal authority to pursue foreclosure against the Subject Property.

**(b)  Countrywide Homes Did Not Effectively Transfer Plaintiffs' Original Note Thereby Ensuring a Clear Chain in Title to Plaintiffs' Mortgage**

94. An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization

process – a promissory note and a security instrument (either a mortgage or deed of trust). The rules that govern these transfers are contained in Hawai'i's Uniform Commercial Code ("UCC") and the terms of the PSA.

95. The right to enforce a promissory note can be transferred only by physical delivery of the original note. Under section 3-301 of the UCC, a "person entitled to enforce" an instrument means (with certain exceptions not relevant in this case) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." Thus, section 3-301 ties the enforcement right to possession of the paper. Section 3-302(a) of the UCC provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Under these sections, no one can enforce (and hence, no one can foreclose a mortgage secured by) a negotiable note unless the note has been delivered to that person.

96. Section 2.01(b) of the PSA requires the Depositor to have delivered or cause to be delivered to the Custodians for the benefit of the Certificateholders, the documents and instruments with respect to each mortgage loan as assigned, including (i) (A) The original mortgage note bearing all intervening endorsements or (B) with respect to any lost

mortgage note, a lost note affidavit and indemnity from the Seller stating that the original mortgage note was lost or destroyed; and (ii) the original of any guarantee executed in connection with the mortgage note.

97. Pursuant to the UCC (HRS §§ 490:3-204) and Section 2.01(b) of the PSA, the promissory note and security instrument (mortgage) must be transferred by indorsement (in the same way that a check may be transferred by indorsement) or by sale. Further, the UCC requires that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default (HRS §§ 490:3-201-203).

98. Hawai'i trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the timeliness, indorsement, physical delivery or other requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiffs' Mortgage.

99. The Countrywide Defendants, however, routinely failed to comply with the requirements of the UCC and the PSA for valid transfer of Plaintiffs' (and others) Note and Mortgage to the Trust. In *Kemp v. Countrywide Home Loans, Inc.*, *Bkrtcy. No. 08-18700 (D.N.J.)*, Countrywide Financial sought to prove that the Bank of New York, was trustee for a residential MBS issuing

trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage. Countrywide Financial presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing LP ("Countrywide Servicing") for approximately 10 years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing. Ms. DeMartini testified that, Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer of the loan.

100. Even though DeMartini was presented by Countrywide Financial as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, her testimony, in fact, proved that the loan documents were never validly transferred. She testified that an allonge to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee. Indeed, she testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred.

101. DeMartini also testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was Countrywide's standard business practice:

> Q.  Ms. DeMartini, is it generally the custom to – for your investor [*i.e.,* the issuing trust] to hold the documents?
>
> A.  No. They would stay with us as the servicer.
>
> Q.  And are documents ever transferred to the investor?
>
> A.  If we service-release them they would be transferred to whomever we're service-releasing them to.
>
> Q.  So I believe you testified Countrywide was the originator of this loan?
>
> A.  Yes.
>
> Q.  So Countrywide had possession of the documents from the outset?
>
> A.  Yes.
>
> Q.  And subsequently did Countrywide transfer these documents by assignment or an allonge?
>
> A.  Yes.
>
> Q.  And –
>
> A.  Well, transferred the rights, yes, transferred the ownership, not the physical documents.
>
> Q.  So the physical documents were retained within the corporate entity Countrywide or Bank of America?

A.   Correct.

Q.   Okay.  And would you say that this is standard operating procedure in the mortgage banking business?

A.   Yes.  It would be normal – the normal course of business as the reason that we are the servicer, as we're the ones that are doing all the servicing, and that would include retaining the documents.

102. At a subsequent hearing in September 2009, Countrywide's counsel state that:

> [A]lthough…the UCC and the Master Servicing Agreement apparently requires that, procedure seems to indicate that they don't physically move documents from place to place because of the fear of loss and the trouble involved and the people handling them.  They basically execute the necessary documents and retain them as long as servicing's retained.  The documents only leave when servicing is released.

103. Based on the evidence quoted above, Chief Bankruptcy Judge Judith H. Wizmur held in November 2010 that the Bank of New York, as trustee for the issuing trust, could not enforce the mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement.  Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note.
>
> *Kemp v. Countrywide Home Loans, Inc.*, No. 08-18700-JHW, Slip Op., at *10-11 (Bkrtcy. D.N.J. Nov. 16, 2010)

**(c)   BNY Mellon Does Not Hold Title to the Mortgage as it was Not Deposited into Trust Before the Trust Closing Date.**

104. Hawai'i trust law generally requires strict compliance with trust documents, including the PSA.   Failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiffs' Mortgage.

105. Section 2.01 of the PSA governing the Trust into which Plaintiffs' Note was purportedly entered, represents and warrants that

> [T]he Depositor has delivered or caused to be delivered to the Custodians for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note…or (B)with respect to any Lost Mortgage Note, a lost note affidavit and indemnity from the Seller stating that the original Mortgage Note was lost or destroyed, (together with a copy of such Mortgage Note, if available).

106. The PSA further represents and warrants in relation to the assignment of a MERS Mortgage Loan that:

> [T]he related Servicer agrees that it will cause, at the Seller's direction and expense, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased or substituted in accordance with this Agreement) the

information required by the MERS® System to (a) identify the Trustee and (b) identify the series of the Certificates issued in connection with such Mortgage Loans. The related Servicer shall report to the Depositor and the related Custodian the status of updating all applicable assignments with MERS within 60 days of the Closing Date and shall confirm in writing to the applicable Custodian once all assignments are updated with MERS.

107. In other words, on or before the Closing Date, the original Note must have been delivered or caused to be delivered to the Custodian and, within 60 days after the Closing Date, the Servicer must provide written confirmation to the Custodian evidencing the assignment of the Mortgage. The Custodians under this PSA are LaSalle Bank, National Association and Wells Fargo Bank, N.A., each of which acts as an agent on behalf of the Trustee, BNY Mellon.

108. Plaintiffs submit that neither the Note nor the Mortgage was entered into the Trust in accordance with the terms and conditions of the PSA.

109. Plaintiffs allege that the original Note never left the possession of Countrywide. It is the admitted practice of Countrywide to maintain possession of the original Notes. There is no evidence that a lost note affidavit was entered into Trust by the Closing Date. In the absence of evidence to the contrary, Plaintiffs allege that neither the Note nor a valid

lost note affidavit was deposited into the Trust prior to the Closing Date.

110. With respect to the assignment of Plaintiffs' Mortgage, the evidence clearly indicates that the Mortgage was not assigned to BNY Mellon until November 25, 2009 or July 1, 2010; approximately three to four years after the Closing Date of the Trust. Plaintiff submits that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, no later than 60 days after the Closing Date.

### CLAIM II
**(Unfair and Deceptive Acts and Practices Against Countrywide, McNally and Brown)**

111. HRS § 480-2(a) provides in pertinent part that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." While the statute does not specifically define the terms "unfair" or "deceptive" acts or practices, the Hawai'i Intermediate Court of Appeals has adopted the definition that "a practice is unfair when it offend established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Tokuhisa v. Cutter Management Co., 122 Haw. 181, 223 P.3d 246, 259 (Haw.*

*App. 2009) (citation omitted); Balthazar v. Verizon Haw., Inc.,*

*109 Haw. 69, 123 P.3d 194, 202 (Haw. 2005).*

112.  In addition, the Supreme Court of Hawai'i has noted that

> ...[i]t is impossible to frame definition swhich embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to defined unfair practices so that the definition will fit business of every sort in every part of this country.

113.  *Haw. Med. Ass'n, 148 P.3d at 1209 (citation* and internal quotation marks omitted).

114.  The Supreme Court of Hawai'i has "referred to the meaning of a deceptive practice by citing the definition employed by federal courts with respect to 'an act causing, as a natural and probable result, a person to do that which he or she would not otherwise do.'" Balthazar, 123 P.3d at 202 (citation and brackets omitted).11 A deceptive practice has also been defined as having "the capacity or tendency to mislead or deceive." Tokuhisa, 223 P.3d at 259 (quoting State by Bronster v.United States Steel Corp., 82 Haw. 32, 919 P.2d 294, 312, 313 (Haw. 1996)). The Supreme Court of Hawai'i also stated that

"actual deception need not be shown; the capacity to deceive is sufficient." U.S. Steel Corp., 919 P.2d at 313.

115. The statute also directs courts to construe the chapter "in accordance with judicial interpretations of similar federal antitrust statutes[.]" HRS § 480-3.

116. Hawai'i courts have also adopted a three-part analytical test for "deception" based upon in In re Cliffdale Assocs., Inc., 103 F.T.C. 110 (1984). *Tokuhisa*, *223 P.3d at 260*. The test states a deceptive act or practice is:

> (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) the representation, omission, or practice is material.
>
> A representation, omission, or practice is considered "material" if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.
>
> Id. (quotations and internal marks and citations omitted)

117. Moreover, the *Tokuhisa* court clarified that the *Cliffdale Assocs*. test is objective, turning on whether the act or omission "is likely to mislead consumers," as to information "important to consumers," in making a decision regarding the product or service. Id. (internal marks and quotations omitted). Accordingly, the application of an objective "reasonable person" standard, such as in the Cliffdale Assocs. test, is ordinarily

for the trier of fact, rendering summary judgment "often inappropriate." Id. ((internal marks and quotations omitted).

118. Hawai'i courts have indicated that the terms unfair and deceptive should be interpreted broadly. Specifically, the Supreme Court of Hawai'i and its appellate courts have stated that HRS § 480-2:

> outlaws unfair methods of competition and unfair or deceptive trade practices in sweeping terms. It was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen.
>
> *Han v. Yang, 84 Haw. 162, 931 P.2d 604, 619 (Haw. App. 1997)* (citations, internal quotation marks, and brackets omitted).

**(a)   Countrywide Defendants' Unfair and Deceptive Practices**

119. Plaintiffs submit that Countrywide Defendants' lending policy promoted a deceptive scheme, the primary purpose of which was to sell ever-increasing numbers of loans to the secondary market without regard to borrowers', including Plaintiffs', ability to repay those loans.

120. Countrywide Defendants' lending policy promoted an unfair and deceptive scheme that effectively induced many borrowers, including Plaintiff's, into high-risk, complicated loan terms by "hard-selling" only those high-risk loan terms, such as 7 year Hybrid ARM loans, without regard to borrowers',

including Plaintiffs', ability to meet the long-term obligations under such loans.

121. Countrywide Defendants created a high-pressure sales environment that propelled its loan officers, including Defendant McNally, to meet high production goals and close as many loans as they could without regard to borrowers', including Plaintiffs', ability to repay.

122. The Countrywide Defendants' high-pressure sales policy drove loan officers, including McNally, to sell the riskiest types of loans, including the Hybrid ARM loan sold to Plaintiffs, because loan officers, including McNally, deceptively focused Plaintiffs' attention on the low initial monthly interest rates. In pushing Plaintiffs into the Hybrid ARM loan, McNally, as an agent for Countrywide, intentionally misrepresented the full, true and plain options available to Plaintiffs.

**(b)   Defendant McNally's Unfair and Deceptive Practices**

123. Plaintiffs submit that Defendant McNally induced Plaintiffs into accepting a Hybrid ARM loan without regard to their long-term ability to repay such loan by intentionally misrepresenting the full, true and plain loan options available to Plaintiffs.

124. Plaintiffs further submit that Defendant McNally deceptively induced Plaintiffs into purchasing the Ohana Property by intentionally misrepresenting the viability of the Ohana Property as a TVR. McNally misled Plaintiffs to believe that they could easily obtain a permit to rent out the Ohana Property as a TVR when, in fact, McNally knew or ought to have known that such permits were not likely to be issued.

125. Plaintiffs submit that McNally unfairly and deceptively demanded that Plaintiffs make an immediate additional down payment on the Subject Property the day before closing. McNally did not provide sufficient evidence to Plaintiffs that this demand for additional payment was legitimately and validly warranted on account of Countrywide's lending policy. Moreover, Defendant McNally did not provide sufficient or convincing evidence as to why the initial down payment amount was $300,000. The arbitrariness of McNally's demand for an additional down payment is further exemplified by his subsequent downward adjustment of that amount to $150,000.

126. Plaintiffs believe and on that basis allege that Defendant McNally unfairly and deceptively capitalized on the demand for an additional down payment by personally loaning Plaintiffs $150,000. Defendant McNally took advantage of the fact that Plaintiffs had already expended approximately $35,000 and a significant amount of time and energy in moving the

majority of their personal belongings from California to Maui. By demanding an additional down payment the day before escrow was due to close on the loan, McNally knew or ought to have known that Plaintiffs could be more easily persuaded to accept his personal loan and continue with closing. McNally collected a profit of approximately $20,000 in interest payments and penalties as a result of his personal loan to Plaintiffs.

127. Defendant McNally unfairly and deceptively represented to Plaintiffs that the loans for the Subject Property and Ohana Property must close simultaneously. McNally deceptively represented to Plaintiffs that, if the loans did not close simultaneously, then Plaintiffs would not be able to obtain either loan and would subsequently lose both properties. Plaintiffs believe and on that basis allege that McNally obtained a considerable financial benefit in referring Plaintiffs to his former colleague, Smith, and in arranging the loan for the Ohana Property with Smith on Plaintiffs' behalf. Plaintiffs submit that McNally's representation that both loans must close simultaneously was part of a deceptive scheme by which McNally sought to capitalize on the immediate sale of both properties.

**(c)   Defendant Brown's Unfair or Deceptive Practices**

128. Plaintiffs submit that Defendant Brown unfairly and deceptively induced Plaintiffs into purchasing the Subject Property under the original promise that Plaintiffs and Brown would be able to do a 1031 exchange.   It became clear to Plaintiffs approximately a week before the house and cottage were due to close that Brown had opted out of the 1031 exchange. As a consequence of not doing the 1031 exchange, Plaintiffs would have to put down an additional $300,000.   Plaintiffs subsequently told Brown that they would not proceed with purchasing the cottage as they could not afford the additional $300,000 down payment.   It was then that Brown offered to carry the $300,000 note.

129. On information and belief, Plaintiffs submit that Defendant Brown unfairly and deceptively withdrew his offer to do the 1031 exchange a week prior to closing knowing that Plaintiffs had already incurred significant costs in moving their belongings to Maui and that they could be more easily persuaded to accept his personal loan and continue with closing.

130. Defendant Brown also engaged in deceptive practices by misrepresenting to plaintiff the true reasons why the Brown Note was ultimately in the name of Brown's wife, Jessica Taguiped. Brown initially represented to Plaintiffs that the Brown Note was in the name of Jessica Taguiped for tax purposes; however,

Plaintiffs subsequently learned that McNally had instructed Brown to put the Brown Note in his (Brown's) wife's name so that Countrywide would not discover that Brown was assisting Plaintiffs with the down payment.

131. On information and belief, Plaintiffs submit that Defendant Brown unfairly and deceptively concealed the true reason for putting the Brown Note in the name of Jessica Taguiped in order to capitalize on a personal loan with Plaintiffs out of sight from Countrywide. Defendant Brown collected a profit of approximately $40,000 in interest payments and penalties on the $300,000 loan to Plaintiffs.

132. Defendant Brown further deceived Plaintiffs by misrepresenting the viability of the Ohana Property as a TVR. Brown misled Plaintiffs to believe that they could easily obtain a permit to rent out the Ohana Property as a TVR when, in fact, Brown knew or ought to have known that such permits were not likely to be issued.

133.

**Equitable Tolling and Fraudulent Concealment**

134. In the recent decision, *Rundgren v. The Bank of New York Mellon, 2011 U.S. Dist. LEXIS 20873*, the Hawai'i District Court held that the equitable tolling doctrine of fraudulent

concealment applies to toll the statute of limitations on a Ch. 480 claim.  The Court stated:

> ...from a practical standpoint, if fraudulent concealment did not apply to toll the statute of limitations on a Ch. 480 claim, then a plaintiff would have no remedy whatsoever where a defendant has in fact fraudulently concealed a cause of action from the plaintiff. Given that Ch. 480 is "to be construed liberally in order to accomplish the purpose for which [it was] enacted," the court rejects that there are no instances in which tolling may apply. *See Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 68, 905 P.2d 29, 43 (1995).* Thus, to construe HRS Ch. 480 in accordance with federal cases interpreting similar federal antitrust laws such as *15 U.S.C. § 15b*, the court holds that the statute of limitations on a HRS Ch. 480 claim may be tolled under the equitable tolling doctrine of fraudulent concealment.

135. Plaintiff submits that the Countrywide Defendants and Defendants McNally and Brown affirmatively concealed information that, under the circumstances of this case, led Plaintiffs to believe that they did not have a claim for relief.

136. While it has been recognized by Hawai'i courts that silence or passive conduct of the defendant is not deemed fraudulent, where the relationship between the parties imposes a duty up on the defendant to make particular disclosures, such silence or passive conducts is fraudulent (*Rundgren, 2011 U.S. Dist. LEXIS 20873 *5*).  Plaintiffs submit that their relationship with the Countrywide Defendants and Defendants

McNally and Brown were all of such nature that would render non-disclosure of material information fraudulent.

137. Plaintiffs submit that the Countrywide Defendants fraudulently concealed at least the following information from Plaintiffs:

  (a)   Countrywide Defendants failed to disclose or misrepresented the risks associated with the 7 year Hybrid ARM loan;

  (b)   Countrywide Defendants promoted only those loan options that contained high risks of long-term default while actively concealing alternative lower risk loan options that were similarly appropriate for Plaintiffs;

138. Plaintiffs submit that Defendant McNally and Defendant Brown fraudulently concealed the fact that Plaintiffs would not likely be able to obtain a permit to operate the Ohana Property as a viable TVR.  In fact, Defendants McNally and Brown both actively misrepresented the true nature of the Ohana Property's viability as a TVR to Plaintiffs to induce them into purchasing the Ohana Property.

## CLAIM III
### (Breach of Fiduciary Duty Against Defendant McNally)

139. Plaintiffs submit that at all relevant times Defendant McNally was acting as their mortgage broker and, as such, owed a fiduciary duty to Plaintiffs to act in their best interests.

140. Applicable Hawai'i law defines a "mortgage broker" as "a person not exempt under *section 454-2* who for compensation or gain, or in the expectation of compensation or gain, either directly or indirectly makes, negotiates, acquires, or offers to make, negotiate, or acquire a mortgage loan *on behalf of a borrower* seeking a mortgage loan."[5]

141. Plaintiffs contend there is at least a genuine issue of material fact that McNally acted "on Plaintiffs' behalf" in arranging and negotiating the Plaintiff's loan for the Ohana Property with Smith.

142. While Hawai'i law makes clear that no fiduciary duty exists between lender and borrower, Hawai'i courts have recognized that, in some cases, a "special relationship" exists between the lender and borrower sufficient to create a fiduciary relationship.   In *McCarty v. GCP Management, LLC, 2010 U.S.*

---

[5] HRS Chapter 454 was repealed (effective July 1, 2010) and replaced with the Secure and Fair Enforcement for Mortgage Licensing Act, HRS Chapter 454F. A new term "mortgage loan originator" is defined as "an individual who for compensation or gain or in the expectation of compensation or gain: (1) Takes a residential mortgage loan application; or (2) Offers or negotiates terms of a residential mortgage loan." *See* 2009 Haw. Sess. L. Act 32, §1.   *See id.* § 9 ("[Act 32] shall not affect rights and duties that have matured, penalties that were incurred, and proceedings that were begun before the effective date of the individual's license  [*11] under this Act.").

Dist. LEXIS 122585, 2010 WL 4812763 (D. Haw. Nov. 17, 2010),, the court stated that "[s]uch a relationship might arise where there is inequality of bargaining power." The court cited *Miller v. U.S. Bank of Wash.*, 72 Wn. App. 416, 865 P.2d 536, 543 (Wash. App. 1994), affirming that "[a] quasi-fiduciary relationship may exist where the lender has superior knowledge and information, the borrower lacks such knowledge or business experience, the borrower relies on the lenders' advice, and the lender knew the borrower was relying on the advice."

143. In *McCarty*, the court stated:

> There is no evidence that Hammond or Lusk sought to obtain financing for Plaintiffs' needs from any *other* institution besides their own (GCP). They did not act as "intermediaries" between Plaintiffs and lenders in an attempt to find financing. Rather, the transaction was a commercial loan negotiated between Plaintiffs and GCP.

144. This suggests that, had the lender arranged financing from another institution besides its own, or acted as an intermediary between the plaintiff and another lender in an attempt to find financing for the plaintiff, then such acts would be characterized as falling under the rubric of "mortgage broker."

145. Defendant McNally arranged the financing for the Ohana Property, and otherwise acted as an intermediary on Plaintiffs' behalf, with Smith from First Horizon.

146. McNally was also in a position of superior knowledge and information about the real estate market on Maui. It was that superior knowledge that Defendant McNally used to gain the trust of Plaintiffs in respect of their purchase of the Ohana Property. Indeed, Plaintiffs relied on McNally's knowledge as trusted broker when they acted upon his representation that the Ohana Property would be a profitable investment property.

147. Plaintiffs submit that Defendant McNally breached his fiduciary duties to Plaintiffs in at least the following ways:

(a) Defendant McNally steered Plaintiffs into a high risk loan by failing to disclose alternative lower-risk loans that Plaintiffs were otherwise eligible for;

(b) Defendant McNally failed to disclose the true risks associated with the 7 year Hybrid ARM loan despite knowing that there was a real and substantial risk that Plaintiffs may not be able to meet the long-term obligations under such loan;

(c) Defendant McNally deceptively and for his own economic benefit induced Plaintiffs to accept a $150,000 personal loan from him by demanding a last minute additional down payment the day before the loan was due to close; and

(d)   Defendant McNally induced Plaintiffs to purchase the Ohana Property by deceptively representing to Plaintiffs that they would be able to use the Ohana Property as a TVR when, in fact, McNally knew or ought to have known that Plaintiffs were unlikely to be granted a TVR permit.

## CLAIM IV
### (Violation of Federal Anti-Trust Statutes Against Countrywide Defendants, Bank of America Defendants and MERS)

148. The allegations contained in the preceding paragraphs of this Complaint, particularly ¶¶ 26-34, are incorporated herein by reference.

149. Plaintiffs are informed and believe and on that basis allege that Bank of America, along with six large private banking institutions operating within the United States sued as DOES 1-6 (collectively "the Big Six"), agreed, beginning in or about 1994, to a scheme by which they would and did set up a private system of recording interests in land in the United States, that would give them a competitive advantage over smaller banking institutions to transfer mortgage loans freely into securitized pools of like mortgages; this system became Defendant MERS.

150. Plaintiffs are further informed and believe and on that basis allege that, subsequent to the creation of MERS, the

Big Six used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the Big Six.

151. Plaintiffs are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Six were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually excluded from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Six, such that those institutions are denied the benefits of the interest generated by such mortgages and the income generated from servicing those mortgages.

152. Plaintiffs are further informed and believe and on that basis allege that, subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending, such

as construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

153. Plaintiffs are further informed and believe and on that basis allege that, subsequent to the creation of MERS, the Big Six and MERS used their control over the residential mortgage market by inflating the market for residential properties in the United States and thereby increasing the proportionally-based fees that such larger loans would generate.

154. Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization. The Big Six's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated. The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels. It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Six would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

155. The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Six or independent brokers. The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

156. The originators would then be under pressure to make such loans to their customers, regardless of the customers' needs. Given that the Big Six virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

157. Because larger loans generated larger fees, the originators would steer customers toward larger loans, whether or not such larger loans were within the customers' means.

158. In order to facilitate the granting of larger loans, the Big Six developed loan products that did not depend on proof of a borrower's income, but rather depended on the value of the real property secured by the loans.

159. In order to justify the granting of larger loans, pressure was brought to bear upon property appraisers: those who would not "hit the number" (appraise a property at a value that the lender wanted to lend) would not be given further business.

160. As the result of the acts described above, the Big Six were able to increase the size of loans they made, bought, and securitized, allowing them to take their gains and redeploy them into even larger securities, and in the process were able to inflate the prices of residential real property to a point where they were far beyond the means of the purchasers to whom they

were readily giving loans, according to the lending standards they themselves had developed and used for decades.

161. Plaintiffs are further informed and believe and on that basis allege that the Big Six knew that a business which depended on ever-increasing real estate values was unsustainable, and purposely created and used MERS to serve as a "firewall" between themselves, the loan originators, and the borrowers they were routinely pulling into unsustainable debt.

162. Plaintiffs are further informed and believe and on that basis allege that the Big Six also depended upon MERS to give them a quick and efficient way of rationalizing the interests they would need to secure interests in the real property, whether or not such rationalizations reflected the true relationship between lender and borrower, once their scheme of inflating prices reached its natural and inevitable point of saturation, real estate prices began to fall, and borrowers fell into financial distress.

163. Plaintiffs are further informed and believe and on that basis allege that the Big Six also created securities generally known as credit default swaps ("CDS"), in which they took positions against the mortgage securities they created, in effect betting against the very home loan borrowers they had sought to entice into loans on constantly appreciating residential real property, knowing that those borrowers would

eventually be unable to meet those inflated obligations that the Big Six had endeavored to create.

164. Plaintiffs are further informed and believe and on that basis allege that Bank of America, (a) knew of and acquiesced to the creation of MERS by the Big Six, and actively used MERS to facilitate the creation of its own mortgage loan securities, and (b) knew of the acts of the Big Six described above in inflating the mortgage market, and knowingly and willfully accepted the benefits of such an inflated market in the form of increased fees for servicing residential mortgage loans and residential mortgage securities.

165. Plaintiffs are further informed and believe and on that basis allege that Bank of America agreed to include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between Bank of America as a "member" of MERS, MERS itself, and the Big Six, sued here as DOES 1-6, inclusive, to (a) protect and insulate Bank of America from otherwise valid claims and' defenses by mortgagors and borrowers by providing an intermediary in the transaction; (b) provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans and DOE Defendants 1-6; and (c) eliminate competition in the real residential loan industry in that consumers are offered only loans that conform to the

preset parameters of securitization pools, and cannot obtain loans that more closely fit their particular needs.

**Defendants' conduct, as described above violates the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2.**

166. As the result of the conduct of Bank of America, MERS, and DOES 1-6 described above, Plaintiffs have been damaged, in that they have been subject to the imposition of artificially inflated mortgage rates and fees for mortgage servicing, without any meaningful choice, and without any opportunity to bargain for more advantageous fees, such fees being added to any balance due to the mortgagee in the event of default, all inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which is prohibited by the Sherman and Clayton Anti-Trust Acts, 15 U.S.C. § 2 et seq.

167. Section 4 of the Clayton Antitrust Act, codified at 15 U.S.C. §15, provides as follows:

> [A]ny person who shall be injured in their business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

168. Plaintiffs allege they are such persons injured in their property, and are therefore entitled to bring an action against Defendants for Defendants' actions complained of above.

169. As a direct and proximate result of the unlawful conduct of Bank of America, MERS, DOES 1-6, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount to be determined, and subject to treble augmentation.

170. Plaintiffs have also been required to retain legal counsel and therefore request that the defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to 15 U.S.C. §15.

### CLAIM V
### (Violations of the Hawai'i Anti-Trust and Anti-Monopoly Acts)

171. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

172. Mortgage lending and servicing in Hawai'i is an activity in or affecting interstate commerce under Section 2 of the Sherman Act, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

173. The conduct of the Countrywide Defendants, MERS and DOES 1-6, and each of them, as described more fully above, violates the Hawai'i Monopolization Act, Hawai'i Revised Statutes § 480-9.

174. As a direct and proximate result of the unlawful conduct of the Countrywide Defendants, MERS and DOES 1-6, and

each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiff have suffered pecuniary damages in an amount to be determined at trial.

175. Plaintiffs have also been required to retain legal counsel and, therefore, request that Countrywide Defendants, MERS and DOES 1-6, and each of them, be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to HRS § 480-9.

## CLAIM VI
### (Injunctive Relief Against Defendants BNY Mellon)

176. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

177. Plaintiff, upon information and belief that Defendant BNY Mellon, as Trustee for the Trust, intends to conduct a non-judicial foreclosure sale of the Subject Property pursuant to a notice served upon them on August 27, 2010.

178. Plaintiffs have alleged facts that demonstrate a likelihood that Plaintiffs will succeed on the merits of their claims set forth in this Complaint.

179. Plaintiffs further allege that, should Defendant BNY Mellon follow through with its stated intention to foreclose upon the Subject Property, they will suffer irreparable harm, including, but not limited to loss of their rights to rescind the loan transaction, loss of the use and enjoyment of the

Subject Property, and loss of their right to exclude others from entering, making use of, or removing things of value from the Subject Property.

180. Plaintiffs further allege that the balance of hardships between Defendant BNY Mellon and them falls firmly and unequivocally in their favor. Plaintiffs depend on the Subject Property as their home, while Defendant BNY Mellon is a large business organization with ample assets upon which to depend, and no interest in the Subject Property beyond selling it to a third party.

181. Plaintiff, therefore, seeks an order from the Court enjoining Defendant BNY Mellon from conducting the sale of the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all parties to this action.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand Judgment against Defendants, as follows:

      (a)   For an order enjoining BNY Mellon from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually

agreed settlement made between all of the parties to this action;

(b)   For a judgment awarding statutory damages in such amounts as shall be established at the time of trial;

(c)   For a judgment awarding treble damages according to proof;

(d)   For a judgment awarding exemplary damages in such amounts as shall be proven at the time of trial;

(e)   For a judgment awarding reasonable attorney's fees according to proof;

(f)   For a judgment awarding compensatory damages in such amounts as shall be proven at time of trial;

(g)   For costs of suit incurred; and

(h)   For such other relief as the Court deems just and equitable.


## DEMAND FOR JURY TRIAL

Plaintiff CHESTER A.K. DILLEY, INDIVIDUALLY AND AS TRUSTEE OF THE CHESTER DILLEY SR. REVOCABLE TRUST DATED OCTOBER 14, 1993, hereby demands trial by jury on all issues triable by right to a jury.

Dated March 8, 2011, at Wailuku, Hawai'i.

IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY

_____
JAMES H. FOSBINDER
*Attorney for Plaintiff*